which is Charles v. Johnson. Good morning, Mr Goldberg. How are you? I am fine, Your Honor. Good to see you. Nice to see you. May it please the court, I represent Ethan Charles in this case. This arises on a summary judgment and I think a fair reading of what happened below is that the court construed many, many facts against Mr. Charles. So let me start off this. I think the most important thing in this case is Brittany Gunter's affidavit. She testified at the start of this incident that Mr. Thacker, without any warning, still having failed to tell Ethan Charles he was under arrest, body slammed Ethan to the ground. Ethan's head hit the ground at least twice. Mr. Goldberg, just a moment. You're talking about an affidavit. Was she deposed later? She was deposed later, Your Honor. When did you disclose that affidavit to the other side? I disclosed the fact of the affidavit before the hearing, but didn't give them the affidavit. And, Your Honor, I was relying upon case law from this district. In particular, Charles Oaks, bar 46, 5th Street, 1361. Let's get that straight. So when you say the hearing, you're talking about the summary judgment hearing? No, Your Honor. They knew about... Hold on one second. Let me think about the way you phrased that. I just want to know when the other side became aware that there was an affidavit prior to her deposition. When did the other side become aware of that affidavit? Because I'm not sure that we should be relying on anything she said in an affidavit when she later gave a deposition under oath. Admittedly, the other side not knowing that she had already given an affidavit. Your Honor, let me be clear about the answer to your question. They knew that the affidavit existed. The affidavit was under oath. They didn't know what it said? They didn't know what it said. And I took the position that it was a work product based on the case law that I just cited to you. And then I subsequently used the affidavit. How can you... I'm sorry, Chief. I'm having trouble understanding that argument. How can you claim something is a work product and then file it with the district court and not give the other side the opportunity to cross-examine the person who signed the affidavit? Your Honor, I relied upon the case law that I cited in my brief, a Northern District of Georgia case that was on point. While they said something about it at the deposition, they never followed up on it at all. They didn't complain before the district judge. And I believe that I had case law that supported me. So you have a hidden affidavit in your file. It did get depositioned. She says one thing and you want to create... And then you want to say, aha, here's the affidavit you never saw before, you didn't know about, didn't have an opportunity to cross-examine her about. And this creates a genuine issue of material fact. Are you telling me the district court has permitted that kind of thing? Your Honor, it's cited in my brief. In reply, I cited a district court case from Georgia and I cited one from California. Well, we'll see if that's the law of the 11th Circuit. I want to get to some fundamental questions about the record, Mr. Goldberg, that I think you could help me with. And that is... Yes, Your Honor. So we have a video. I've watched the video. I think part of the problem here is that I do think Judge Story inferred some things that are just not on the video. That's correct, Your Honor. I'm not sure they're unreasonable inferences. If this ever got to a jury, I think you'd have a tough case, Mr. Goldberg. But I want to understand something. As I understand it, the record is that when your client went down on the ground, there was not blood on the ground under his head. When he was removed. He then went over into the squad car and flailed about inside the back of the police car. And there was a lot of blood back there. And he did bleed. He hit his head. But as I understand it, the individual, the bystander who participated in holding down your client grabbed his neck. And your client, your position is that that individual was acting under color of state law, under color of law. And therefore, some of the injury that came about as a result of holding down, putting him in a chokehold, in essence, is covered here. But I know there were little scrapes on his legs and that sort of thing. But it seems like the major injuries we're talking about, to the extent that there are for an excessive force claim, are the grabbing of the neck and then what occurs in the back of the police car. Is that right? Your Honor, I don't quite agree with that. Let me be clear about this. There's no doubt in the world that the officers are not responsible for Mr. Charles banging his head in the police car. There's no doubt about that. And some of what he suffers with his gashing of his head and his bleeding is a result of him doing that, right? Some of that, yes. But his mother testified that she saw marks on his neck four days later. The neck is from the chokehold from the bystander, right? That's right. But let me go further for a second. Okay. What we're back to is de minimis kind of arguments. And this court has adopted what the Supreme Court did for prisoners, which says that de minimis is not a defense. That you don't escape liability because the marks don't show up. And in the Supreme Court cases that involved prisoners that are cited in Stephen's... I thought the law was that for it to be excessive force, that if the only evidence you have of, quote, an injury is something de minimis, that it won't support a claim of excessive force. I just want to understand where it crosses the threshold. What are the injuries that cross the threshold here? Your Honor, this court has twice said that you don't look at de minimis. That was Stevens v. Giovanni and Sanders v. Duke. And in each of those cases, the court is citing to an Eighth Amendment case from the Supreme Court, two Eighth Amendment cases from the Supreme Court. And in those cases, the Supreme Court said just because marks don't show up doesn't mean there hasn't been excessive force. And in particular, they're quoting Justice Blackmun, who talks about some kind of... This is a Fourth Amendment claim. You're telling me we have said in the Fourth Amendment context that de minimis injury is not part of the inquiry? Your Honor, there's two cases that said that. But I'd like to say, Your Honor, that if you have an Eighth Amendment violation, it ought to be a Fourth Amendment violation. But the answer is that there are two cases in this court citing those Eighth Circuit cases. Eighth Circuit or Eighth Amendment? That are in my brief and reply brief. So that's the first thing. Your Honor, I'm sorry, you had a long list of questions and I can't remember all of them. I'm just trying to sort out what you're complaining about in terms of the injuries that you say were the result of excessive force. I know about the choking by the bystander. I think you've got a problem about whether that is conduct that was under color of law. I know about that he suffered some injury, self-inflicted, in the back of the police car. And I'm trying to figure out to the extent that he was being wrestled and dealt with, even slammed in some sense by the officer who was arresting him. What's the evidence that whatever that officer did was excessive force when you take out those issues? Well, Your Honor, I think when you slam somebody to the ground, and Your Honor, the difference in the wording back at the deputy. He was resisting. I mean, there's no doubt he was resisting. Force could be used against him. The question is, at what point was that excessive? Your Honor, the case law talks about the difference between active resisting and non-active resisting. Mercado, for example. I've watched it. I mean, he actively resists. I've watched the video. Your Honor, the video part that you're watching is the third stage. What you have is when Mr. Thacker takes my client down to the ground, there is no video. When Mr. Leckie and Mr. Thacker are doing whatever they're doing to Mr. Charles, there is no video. The only video there is, is the third stage when Mr. Brantley shows up. So whatever video you've watched does not cover the first, you know, two incidents for want of a better word. Doesn't Heck preclude that argument? At least as to whoever was a state actor? Well, Your Honor, for two reasons, no. One is Dyer. Dyer has a footnote number and a discussion at 879. And all that they're doing is substituting Florida cases, which is what Dyer dealt with, with Georgia cases. Dyer flat out says that the exact same argument that Mr. Wehmeyer is making on behalf of the officers does not bring us heck. Your position is that our case law, and I think I probably agree with you about this, Mr. Goldberg, is that our case law says that for it to necessarily imply the invalidity of the conviction, you can still have an excessive force claim that in the resisting arrest context, that even after the conviction for resisting arrest, the excessive force comes after, right? Yes. And your contention is that's what happened here. My contention is that... Some of which isn't even caught on the video. Right. But I want to go one step further. The indictment does not mention Mr. Brantley. It mentions Mr. Thacker. And under Dyer, Dyer had an or this, or that, this, or this person or that person and said that that didn't apply because of that. Your Honor, I've used up way more of my time. I'm sorry. No, you're good. You've been on our time. We've had questions for you. I want to make sure, though, that my colleagues don't have more. Your Honor, I would like about a minute or so to just talk about the Rehabilitation Act. Well, if you do that, you're going to be cutting into a rebuttal time, but because you wouldn't otherwise be able to do it then. No, that's correct, Your Honor. I understand that. So take your minute. Your Honor, real quickly. The question is whether or not there's respondeat superior. And the case law, starting with Mason, says that there isn't. And we're back to the opinion you authored in Williams v. Aguirre. It's the earlier case. The other problem is that many of the cases that are cited are cases where the plaintiff didn't raise the issue or waive the issue. And you have decisions that talk about that circumstance being dicta. But the last thing I want to say about that, and then I'll get off of that, is that in Bledsoe v. Palm Beach Soil and Water, a case I didn't cite earlier, at 133 Fed Third 816, this court said that Title II applied to job discrimination under the ADA. So if you're going to have respondeat superior under Mason for Title I, the same cause of conduct is going to have to be proven a different way for Title II. That makes no sense. Mr. Goldberg, you took the minute. We'll give you three on rebuttal. Thank you, Your Honor. Mr. Waymeyer. Mr. Waymeyer, you are muted, so you need to unmute. Take note, Mr. Williams. Thank you, Your Honor. I'm Jason Waymeyer. I'm here on behalf of Officers Thacker, Brantley, and Sheriff Johnson. I am not representing Mr. Leckie. We've decided to split this 10 and 5, but if I get done earlier, then I ask that co-counsel be given my time. Okay. I want to address the evidentiary issue that Mr. Goldberg started with, and then qualified immunity primarily. Of course, I want to answer any questions that the court might have, but it seems to me that the record is one of the court's chief concerns, so I wanted to clarify anything that the court thinks. I want to know where there is any objective evidence that the amount of force that the officer used here was excessive. It seems to me there's no blood on the ground where he was taken down that we can see where we can see it on the video. There is blood in the back of the police car as a result of self-inflicted wounds. I know about the neck injury attributable to the bystander, but that does not appear to me necessarily to be attributable to your clients. My problem is this. It seems to me that Judge Story looks at the video, but he makes some inferences about things that aren't on the video. The plaintiff says that he was being taken down, he was being slammed, etc. He was resisting arrest, no doubt about that. He was convicted of it. We can see some of that on the video itself. But where is there objective evidence about either the absence of or the existence of more than reasonable force being used here? The only thing that I think that Mr. Goldberg has argued that tends to, he claims, show excessive force is Ms. Gunter's declaration or affidavit. That's the only thing that I can see, and I think the reason he did that is because that's not on the video. Everything we can see on video shows there's no excessive force here. So let me talk about Ms. Gunter's affidavit. The court correctly understands the procedural posture of that. We took her deposition. We understood, at least during the deposition, that there was an affidavit. You're saying if we think the declaration's out and it's the deposition that matters, you're saying there's nothing? Absolutely. That's certainly our position. And, you know, beyond any kind of question about should the affidavit have been given to us, should it not, there's a rather easy evidentiary way to resolve this, whether the affidavit comes in or at least to the extent that it conflicts with the deposition testimony. There's a case called Santos. It's a Second Circuit case. I will cite it for the court. It's 243 F 3rd 681, and it's basically the same procedural scenario where a declaration is given, then a deposition is taken, and the deposition conflicts with part or all of the declaration. I would think there's a lot of case law about that. Is there any case law about this unusual circumstance where Mr. Goldberg says you're aware that there is a declaration, you don't know what's in it, and don't have it available to cross-examine the deponent when you take the deposition? And then after the deposition, the plaintiff's lawyer can pull it out and say, oh, but there's this declaration. Is there anything like that that you found? I haven't looked for that, Your Honor, and I've tried to avoid throwing darts at Mr. Goldberg. I'm not, that's not my, I don't think we need to. Well, I'm not asking anyone to throw darts at anyone. I'm just asking, do you have a case about that? I don't at this point, Your Honor. I'm sure they exist, but I have not looked for that, so I can't tell you that I have a case about that. The Santos case, I can say, says this. A prior inconsistent statement, like an affidavit in this case, something that conflicts with the deposition, is not admissible as substantive evidence. If it's admissible at all at trial, it's only admissible as a prior inconsistent statement for impeachment. I had always understood that to the extent that you take someone's deposition and then they try to create an issue of fact with an affidavit or declaration, that you can treat that affidavit or declaration as a sham. That's right. That's the sham affidavit rule. That usually happens when the deposition is taken and then later an affidavit is created. This one is reversed in order. For your purposes, it's the same principle because you didn't have the affidavit available to cross-examine the witness about during the deposition. It doesn't matter if it existed before if you didn't know the substance of it and couldn't cross-examine the witness about it. I would tend to agree with that. I would say also that during the deposition, it was pretty thorough, and Ms. Gunter actually described exactly what she claims she saw. She had the benefit of watching the video. For various reasons, the deposition should control over and is a better record of Ms. Gunter's testimony. What she says is that during this part of the video that we can't see, there was only one sort of anything that we would characterize or could be characterized as excessive force, and that was a tackle. She essentially says he was a bulldog. So Deputy Thacker's shoulder goes into the plaintiff's chest, and they go to the ground together. It's kind of a tackle. I would submit that the case law says you can tackle a person when he's resisted arrest for a minute or so. There's really no real question about that. And a tackle, is that going to cause perhaps scrapes and bruises like the plaintiff says he has here? In regard to the de minimis force argument, my understanding of the case law is this. If the officer is entitled to use force, which he is here, clearly, then de minimis force is covered by qualified immunity, and de minimis injury is covered by qualified immunity. Whereas if the officer has no right, no reason to use force whatsoever, then even de minimis force, even de minimis injury, can support a claim. So here, we're in the category of cases where he's entitled to use force, he's using de minimis force, that's covered by qualified immunity. That's where we are on that. And I think qualified immunity really is the easiest way to resolve this case. There's just no violation of clearly established law here. The plaintiff hasn't cited any cases that would have told these officers that, hey, you're stepping over a line that's been clearly drawn. And that's where I would begin and end with the case. The Rehabilitation Act, I'll say a few things briefly about that. I think Mr. Goldberg has argued that there is respondeat superior liability under the Rehabilitation Act. Mr. Wehmeyer, he... Yes, sir. I want to make sure I'm not muted. You're not muted. All right. We don't get to respondeat superior unless he can prove a prima facie case on the Rehabilitation Act. So I want to ask you, has the plaintiff identified any major life activity to show how his ailments interfere with that activity and therefore is he a disabled person or has a disability? I can make the plaintiff's argument for him and tell you what he says. But I know what he said was, what he actually said was, these things only happen once every other month. These meltdowns only happen once every month. How could that interfere with a major life activity? I share your skepticism, Judge. I don't think it does. Well, he failed to allege a disability, it seems to me. I think that's the point Judge Watkins is getting to. Don't you agree with that, don't you? I absolutely do. I absolutely do. That's not the only reason to dismiss a Rehabilitation Act claim, but yes, I think that... And the magistrate judge in his R&R said that he had not alleged that his panic attacks substantially limit a major life activity, nor has he identified a major life activity. He's unable to perform or restricted in performing compared to an average person in the general population. That seems fatal. I agree with that, and the case law supports that. I would say that if you ever get to respond to you at Superior, there's a case called Lease. I don't have a site here, but the Lease case seems to... Well, it seems to me the other problem is that the modifications of the police procedures that he proposed weren't reasonable. That would be a separate matter. I don't know why we have to ever get to respond to you at Superior. I would agree with that. I don't think officers have to alter their arrest procedures. There's a case I believe called Burkall, and it says, look, during an arrest, it's not reasonable, usually, for officers to figure out whether there's a disability and you've got to accommodate a disability and all that kind of thing. There's exigent circumstances going on, and that sort of ends a Rehabilitation Act claim as well. I'm out of time. You are. Thank you, Mr. Waymire. Mr. Williams. Good morning, Your Honor. Good morning, panel. My name is Matt Williams. I am honored to represent Ryan Leckie here today. I will start by taking the court's indulgence in recognizing that I don't know anything about the subject matter. Let me tell you something about that, Mr. Williams. I appreciate your pro bono representation, but when you undertake the responsibility of representing somebody, you need to figure out what you're talking about. I appreciate that, Your Honor, and I have done the best I can. If we were dealing with train wrecks, I would be very comfortable right now, and maybe this is figuratively a train wreck, but it is not the kind I'm normally accustomed to dealing with. With that being said, I am very grateful to both Judge Fuller and Judge Story for their analysis of the case and recognizing an issue that I was not aware to raise having to do with whether Mr. Leckie qualified as a state actor for Section 1983 purposes. In a way, Mr. Leckie represented himself well initially when he said, hey, I'm just a civilian. It seemed to me he preserved the issue when he said that. Judge Legowicz, do you have a question? I was going to say the same thing, Chief, that I thought that he preserved it when he, in his answer, said he cannot speak on counts 1 through 14, and if you construe that liberally since he's a pro se litigant, I think we can take that as a denial of the allegation. Well, I appreciate that, and perhaps the hidden point in all of that is Mr. Leckie might have been better off if he continued representing himself, but I volunteered nonetheless. And given the analysis by both the magistrate and Judge Story, it is clear that the plaintiff had the burden of establishing, if you will, excuse me, that there was a... A symbiotic relationship, it seems to me. Correct. Some kind of conspiracy. Some kind of a conspiracy, at a minimum, an agreement, a joint enterprise. And there simply is no evidence of that. There is actually no evidence of any communication between the parties, between either Mr. Leckie... I think the district court may be wrong about the conspiracy point, but I do think that the Nexus joint action test would require some evidence of a symbiotic relationship. And as I understand it, the deputy didn't request your client's help, and your client neither expected nor received anything in return for his actions. He was just... He just decided as a citizen to help out a law enforcement officer. That's correct, Your Honor. I mean, at most, you could describe what happened as acquiescence on the part of Deputy Thacker. And there's plenty of case law that says that's not sufficient to establish... If citizen volunteering of that kind is going to be turned into acting under color of law, we're going to really expand some liability here. You're exactly right, Your Honor. And that's a point the Seventh Circuit made in a case cited by Judge Story, Proffitt versus Ridgway. There would be a huge deterrent effect as well on the willingness of private citizens to come to the aid of police in circumstances if you travel down that path. And so I believe the record is very clear that Mr. Leckie was not acting in any official state capacity and that the court was correct in granting his motion for summary judgment on that issue, excluding him from liability under Section 1983. Okay. And if the court has no further questions, that's the sum total of my argument. I appreciate your time. Thank you, Mr. Williams. We appreciate your argument. Mr. Goldberg, you've saved three minutes  Thank you, Your Honor. Your Honor, the Motes case, the Finch case, and the Bendenburg case all support state action in this case, as well as the Dickey's and as well as Price. And in none of those cases was there any kind of, quote, agreement. Motes is a case where the guy takes out a warrant and the court held that that was state action. That there was state action was a facts question. Judge Story and Fuller thought that it was a legal question. Your Honor, with all respect, I said in my brief, I think Judge Ripple had the better argument than Judge Posner. If you disagree, so be it. But he, Judge Posner, did not have to identify or distinguish Motes or Finch or Bendenburg. In those cases, I think stand very clearly for the fact that there was state action. And I think there's also another problem. I mean, you do not want citizens acting as cowboys. You don't want them. That's why you have officers who are trained. That's why SOPs tell you not to use a chokehold. As to whether or not the officers are liable for the chokehold, this is basically going back to Monroe versus Pape. And in the 11th Circuit, actually it was the 5th Circuit, the Neesmith case, where people who act together are liable for the actions of one or other who's acting with them. And Judge Story even said at some point that for some period of time, Mr. Thacker and Mr. Leckie were acting together. The courts have recognized the bipolar is a disability. And I cited to other cases that recognize that, particularly the 2nd Circuit. And I think there's even an earlier 11th Circuit case. But I think the point is this. When you talk about whether or not this alters the arrest procedure, what we were talking about was two minutes. Mr. Thacker's wife has panic attacks. And what do you do? He says, well, I leave her alone and give her space. He had no reason not to give the guy two minutes. He could just as easily, for example, said, you know, Mr. Charles, I'd like to talk to your mother who was on the telephone. That would have been enough to accommodate him, but he didn't even do that. And the reason why, quote, it's not going to happen. That's what it is. If you have any other questions, I'll be glad to answer them. But I think I've said what I need to say. Thank you, Mr. Goldberg. Thank you, Your Honor. I think we understand your case. We'll be in recess until tomorrow morning. Thank you. Thank you. Thank you.